UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| REVITY ENERGY LLC : <br> : <br> *Plaintiff,* : <br> : Case No. <br> v. : <br> : <br> NAUTILUS INSURANCE COMPANY : <br> : <br> *Defendant.* : | |

### COMPLAINT

Plaintiff, Revity Energy LLC ("Revity Energy"), by and through undersigned counsel, hereby files this Complaint against Nautilus Insurance Company ("Nautilus") and alleges as follows:

### PARTIES, JURISDICTION & VENUE

1. This action for declaratory judgment, breach of contract and violation of Rhode Island's bad faith insurance practices statute arises out of Plaintiff's claim for insurance under a Site Specific Pollution Liability policy (attached hereto as **Exhibit A** and hereinafter the "Policy").

2. Revity Energy is a limited liability company organized under the laws of Delaware with its principal place of business located at 117 Metro Center Boulevard, Suite 1007 in Warwick, Rhode Island.

3. Nautilus Insurance Company ("Nautilus") is a company organized under the laws of Arizona with its principal place of business located at 7233 East Butherus Drive in Scottsdale, Arizona.

4. This action is brought pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332. Revity Energy is a citizen of Rhode Island and Nautilus is a citizen of Arizona. The amount in controversy

exceeds the jurisdictional amount of $75,000, exclusive of costs and attorneys' fees. Revity Energy seeks relief from Nautilus in an amount in excess of $75,000.

5. Venue is appropriate in this District under 28 U.S.C. § 1391 because Revity Energy resides in this District, the insurance policy which forms the basis of this dispute was delivered to Revity Energy in this District and the property which is the subject of the dispute is located in this District.

6. The Complaint is filed pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* An actual controversy exists between Revity Energy, on the one hand, and Nautilus, on the other, regarding the existence of insurance coverage and this controversy may be resolved by a judgment in this action.

7. All conditions precedent to coverage and recovery by the Plaintiff have been performed and/or have occurred.

## FACTS

8. On February 13, 2020, Revity Energy LLC and Colvintown Associates, Inc. entered into a Purchase & Sale Agreement for 0 Colvintown Road (Tax Assessor's Plat 85, Lots 1 and 5.003) (the "Property").

9. Section 2.5 of the February 13, 2020 Purchase & Sale Agreement provides as follows:

> 2. SELLER'S REPRESENTATIONS AND WARRANTIES. Seller hereby represents, warrants, and covenants, as a material inducement for Buyer to enter into this Agreement and to purchase the Premises, as follows. Such representations, warranties, and agreements shall not knowingly omit or fail to state any material fact necessary to make the same not misleading. All representations, warranties, covenants, and agreements of Seller contained in this Agreement shall be deemed to be material, shall survive the Closing and shall be and remain in full force and effect thereafter, and Seller shall have a continuing obligation to update the same for the benefit of Buyer. If requested by Buyer, Seller shall provide a certificate to Buyer to such effect dated as of the Closing Date.

\* \* \*

  2.5. To the best of Seller's knowledge without investigation and except as specifically disclosed on EXHIBIT C[1]: (i) no hazardous or toxic wastes, substances, materials, pollutants, nor any asbestos or petroleum-based products (collectively "Hazardous Materials") are now located on, under or at the Premises; (ii) neither Seller nor any other person has ever caused or permitted any Hazardous Materials to be placed, held, located, or disposed of on, under, or at the Premises or any part thereof; (iii) no part of the Premises is affected by any Hazardous Materials contamination; (iv) there is no investigation, administrative order, consent order and agreement, litigation or settlement with respect to Hazardous Materials or Hazardous Materials contamination proposed, threatened, anticipated, or in existence with respect to the Premises \* \* \* .

10. Revity Energy thereafter secured a Site Specific Pollution Liability Policy (No. SSP2032312-10) with effective dates from June 8, 2020 to June 8, 2023 issued by Nautilus Insurance Company ("Nautilus") (attached hereto as **Exhibit A**).

11. On June 19, 2020, a Revity affiliate filed an Application Request for Certificate of Completeness with the Town of Coventry seeking permission to construct a solar facility on the Property, which Application was denied on November 2, 2020.

12. Revity Energy elected not to appeal the denial and, instead, on April 22, 2021, the affiliate filed an Application Request for Certificate of Completeness with the Town of Coventry for proposed residential cluster subdivisions with 18 single family unit lots which Application was granted on April 28, 2021 (the approval was recorded on June 11, 2021).

13. On April 23, 2021, Hoffman Engineering, Inc. ("HEI") issued a letter to Revity Energy stating that HEI had recently conducted fifteen (15) test pits which exposed "a significant amount of glass debris in subsurface soils" and "buried solid waste" and that "RIDEM will allow

---

[1] **Exhibit C** to the Purchase Agreement disclosed only the "[p]resence of tires in a building located on the Premises" and the "[p]resence of unused equipment located on the Premises."

the off-Site transportation and disposal/reuse of this material if it is witnessed and documented by an Environmental Engineer * * *."

14. On April 29, 2021, HEI transmitted correspondence to the RIDEM stating as follows:

> On April 19, 2021, under supervision of HEI and DiPrete Engineering, additional test pits for the purpose of soil suitability for septic systems and leachfields were conducted, and following this work test pits were conducted in an effort to further determine the extent of the apparent glass and/or solid waste debris.
>
> * * *
>
> Based on work conducted at similar Sites, HEI is recommending this material be excavated and transported off-Site for disposal at a licensed solid waste, construction debris, or demolition debris facility.

15. An example of the affected area appears as follows:



16. On April 30, 2021, Revity Energy filed a claim under the Policy.

17. On May 28, 2021, Nautilus, by and through a Claims Attorney from Berkley Environmental, Robert Burkholder, responded to Revity Energy's claim, stating that Nautilus was undertaking an investigation but that Nautilus was reserving its right to deny coverage under the Policy. (May 28, 2021 correspondence attached hereto as **Exhibit B**).

18. More specifically, Attorney Burkholder requested a number of documents to assist in Nautilus's investigation and stated as follows:

> Initially, as confirmed with you, the site is a covered location scheduled onto the Policy with the intended use of redevelopment for a solar farm. Further, the documents submitted show there may be conditions which would be considered pollution conditions under the Policy. However, at this time, no claim has been asserted as a result of the site conditions nor is there any indication at this time that clean-up costs are sought as there is no proposed course of action, scope of work, or regulatory action required. Thus, this remains a potential claim for coverage under the Policy.
>
> We also note that the Material Change in Use exclusion may apply should an actual claim for clean-up costs be asserted. This exclusion precludes coverage for a material change in the use of, or the operations identified on the Declarations page of this policy, or on the Schedule Of Covered Locations With Intended Use Or Operations endorsement(s) attached to this policy, unless the change in use or operations at the covered location is specifically endorsed onto this policy. Under these circumstances, specifically where the intended use is stated as "Redevelopment for a solar farm" and the current application for a "proposed residential cluster subdivisions with 18 single family unit lots," this may apply to this claim to preclude coverage. Accordingly, Nautilus reserves the right to deny coverage based on the Material Change in Use exclusion.

19. On July 1, 2021, a walk-through of the Property was conducted and attended by representatives and agents of Revity Energy and representatives of Nautilus's consultant, Berkley Environmental.

20. On July 26, 2021, Revity Energy transmitted correspondence to Attorney Burkholder responding to his May 28 correspondence and forwarding documents responsive to Nautilus's prior requests. (July 26, 2021 correspondence attached hereto as **Exhibit C**).

21. The July 26, 2021 correspondence stated that the Rhode Island General Laws (R.I. Gen. Laws § 42-17.1-1-2) and the Rhode Island Rules and Regulations for Solid Waste Management Facilities and Organic Waste Management Facilities (250-RICR-140-05-1 and "SWMF Regulations") require that Revity Energy remediate the Property, regardless of whether it is to be used for solar or residential development.

22. The July 26 correspondence explained that the SWMF Regulations define the Property as an unlicensed Solid Waste Disposal Facility, with more than three cubic yards of solid waste, and the correspondence stated as follows:

> Revity Energy is not interested in operating this property as a Solid Waste Disposal Facility and, even if it were forced to do so, it would have to pay more than $100,000 in fees to become licensed as such. SWMF Regulations at § 1.14. These SWMF Regulations make no distinction for use of property in terms of the obligation to either (1) remediate the solid waste or (2) become licensed as a solid waste disposal facility. Obviously, this fact is important, as your May 28, 2021 correspondence states that the Policy's "material change in use" exclusion "precludes coverage for a material change in the use of, or the operations at, a covered location from the use or operations identified on the Declarations page of this policy, or on the Schedule of Covered Locations with Intended Use Or Operations endorsement(s) attached to this policy, unless the change in use or operations at the covered location is specifically endorsed onto this policy."

**Exhibit C**.

23. On August 9, 2021, Attorney Burkholder emailed in-house counsel confirming receipt of the July 26 correspondence and stating that Nautilus is "reviewing the assertions made in your letter, including but not limited to, the assertion that a covered claim has been asserted" and that Nautilus continues to adhere to the position taken in the May 28, 2021 correspondence.

24. In-house counsel responded on August 16, 2021 asking when Revity Energy could expect Nautilus's investigation to be complete.

25. On August 23, 2021, Nautilus transmitted a correspondence stating that "Nautilus continues to reserve all rights as previously set forth in our correspondence with you and as set

forth herein our investigation into this matter continues" and requesting additional documents. (August 23, 2021 correspondence attached hereto as **Exhibit D**).

26. The August 23 correspondence stated that the Policy has a $1 million per pollution condition limit and that "[t]o the extent a response to the SWMF Regulations is required as you suggest, our investigation shows that such a response would require costs and expenses greatly in excess of the $1 million limit amount" but that Nautilus is independently investigating whether the RIDEM and Rhode Island state law "would characterize the site as a Solid Waste Management Facility, necessitating the response you suggest."

27. Revity Energy responded on September 1, 2021, providing additional documents as requested, and restating its demand to be informed as to when Nautilus would conclude its investigation. (September 1, 2021 correspondence attached hereto as **Exhibit E**).

28. The September 1 correspondence did object to Nautilus's request for "any documents after the issuance" of the Town's November 2, 2020 denial of Revity's solar Application because that request did not define the temporal scope or even the subject matter of the documents being requested and sought further clarification of the request. **Exhibit E**.

29. The September 1 correspondence also objected to Nautilus's requests for "all of the internal Revity Energy, LLC documentation regarding the decision to appeal or not appeal" the November 2 solar application denial as well as "all of the internal Revity Energy, LLC documentation regarding the decision to submit the April 22, 2021 Application Request for Certificate of Completeness by Revity Realty, LLC for proposed residential cluster subdivisions with 18 single family unit lots" because it "is unclear to Revity why investigating the legal machinations of Revity's decision not to appeal the November 2 Decision (and rather to pivot to a residential development) is relevant to the issue of coverage under the Policy." **Exhibit E**.

30. On September 17, 2021, the RIDEM inquired of HEI as to Revity Energy's remediation plans, to which HEI responded with the proposed plans and, on September 24, the RIDEM further advised that "after the removal of the solid waste, there needs to be confirmatory sampling at the site to ensure compliance" and requested a proposed soil sampling plan.

31. On September 28, 2021, Revity Energy, through in-house counsel, advised Nautilus of the RIDEM's inquiries and, again, demanded that Nautilus provide its coverage position. (September 28, 2021 correspondence attached hereto as **Exhibit F**).

32. On October 4, 2021, Nautilus issued a supplemental correspondence to Revity Energy restating its request for "any documents related to the Site generated by or received by Revity after [the] Decision related to the Decision, Revity's review of the Decision and reaction to the Decision, the evaluation by Revity to appeal or not appeal the Decision, the evaluation by Revity to submit the Residential Requests and all documentation related to the Residential Request." (October 4, 2021 correspondence attached hereto as **Exhibit G**).

33. Nautilus stated that "[w]e disagree that any further clarification is required for you to respond to our request for documents" and that "Revity's failure to cooperate with Nautilus in its investigation and provide the requested information could limit or bar coverage under the Policy." **Exhibit G**.

34. The October 4 correspondence concluded that "[b]ecause the change in use from Redevelopment For a Solar Farm to a Residential Redevelopment is material, the Material Change in Use Exclusion applies to bar coverage for any increased costs and expenses necessary for the residential development and resulting from the OWTS efforts." **Exhibit G**.

35. Nautilus continued as follows:

In early 2021, and with no prior notification to Nautilus, Revity submitted a Pre-Application to the Coventry Planning Commission for consideration of the 24-lot

8

subdivision. Subsequently, Revity submitted a Master Plan (conceptual) application for 18 lots, which was approved by the Commission in April 2021. Prior to the Master Plan meeting, and as part of the diligence required for the new residential development, the Insured's consultants' tested soils for the suitability of the location of onsite wastewater treatment system ("OWTS") in March 2021. As part of that OWTS effort, Revity discovered widespread buried glass debris, which it classified as solid waste within the meaning of RIDEM's Rules and Regulations for Solid Waste Management Facilities and Organic Waste Management Facilities, 250-RICR-140-05-1 ("Solid Waste Regulations"). This OWTS effort would not have been necessary for the original intended solar farm use. The debris was discovered as a result of diligence needed to determine the suitability of the soil for location of OWTS to service the proposed subdivision homes. Thus, it was the changed development plans that led to the discovery of a reportable environmental condition to RIDEM.

**Exhibit G**.

36. Nautilus further reiterated that "we are undertaking an independent investigation as to whether the Rhode Island Department of Environmental Management ('RIDEM') and Rhode Island state law, would characterize the site as a Solid Waste Management Facility, necessitating the response you suggest, and whether there would be a distinction under any potentially applicable Rhode Island law or regulation regarding use of the site as a solar farm as initially indicated, as opposed to for residential development." **Exhibit G**.

37. Coverage A of the Policy provides as follows:

**COVERAGE A – FIRST PARTY CLEANUP COSTS**

To pay on behalf of the **insured** for **cleanup costs** in excess of the **self-insured retention** that the **insured** becomes legally obligated to pay as a result of a **pollution condition** on, at, under or migrating from a **covered location(s)**, provided that:

1. The **pollution condition** is first discovered during the **policy period** and reported to us, in writing, during the **policy period** or **extended reporting period**, if applicable, and
2. Such **pollution condition** first commences on or after the **retroactive date.**

**Exhibit A** at SSP 6001 06 18 at p. 1 of 17.

9

38. The Policy defines "cleanup costs" as follows:

**Cleanup costs** means the reasonable and necessary expenses incurred for the investigation, monitoring, testing, containment, removal, disposal, neutralization, or treatment of **pollution conditions** to the extent required:

   a. By any legislatively or administratively enacted environmental law, rule, regulation or order applicable within the jurisdiction in which the **covered location(s)** lie(s) including any governmental action or demand pursuant thereto; or
   b. To satisfy a voluntary cleanup program to conduct voluntary cleanup, removal, or remediation of a **pollution condition** that exceeds actionable levels, established pursuant to **a.** above; or
   c. By a **Licensed Environmental Professional (LEP)** in a state where **LEP**s are delegated regulatory authority to oversee an environmental cleanup, to the extent such **cleanup costs** are required by the applicable environmental laws, rules, regulations or orders referred to in **a.** above; or
   d. With respect to **fungus** and legionella, in the absence of any applicable environmental laws established pursuant to **a.** above, to the extent recommended in writing by a **certified industrial hygienist** or an **environmental professional** retained with the prior written consent of the Company as to Coverage A, or as required by a court for Coverages B, C, or D or any other coverages endorsed on this policy; or
   e. With respect to methamphetamines, or other chemicals associated with methamphetamines laboratories, in the absence of any applicable environmental laws established pursuant to **a.** above, to the extent recommended in writing by a **certified industrial hygienist** or an **environmental professional** retained with the prior written consent of the Company as to Coverage A, or as required by a court for Coverages B, C or D or any other coverages endorsed on this policy.

**Cleanup costs** shall include civil fines, civil penalties and assessments resulting from **pollution conditions** otherwise covered under Coverages A or B. **Cleanup costs** also include **emergency expenses** and **restoration costs**, but do not include **property damage**, **bodily injury**, or **loss** from **property damage** or **bodily injury**. **Cleanup costs** do not include costs for improvements or betterments and shall not include any additional costs to bring the existing **covered location** into compliance with any code, law, or regulation that was not applicable and/or enforced against the **covered location** before it was affected by the **pollution condition** except for the additional costs of **green building materials** required to bring existing real property at the **covered location** into compliance with applicable and enforceable mandatory building codes, laws or regulations.

*Id.* at SSP 6001 06 18 at p. 14 of 17.

39.     The Policy defines "Pollution Condition(s)" as follows:

**Pollution Condition(s)** means any of the following:

   a. The discharge, dispersal, release, seepage, migration, or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead, asbestos, silica, hazardous substances, hazardous materials, legionella, electromagnetic fields, low level radioactive waste and low level radioactive materials, medical waste, pathological waste and waste materials into or upon law, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater. Waste includes materials to be recycled, reconditioned or reclaimed; or
   b. The presence of materials listed in paragraph **a.** above that have been first abandoned or first deposited illegally on or after the policy inception date by a third party without the consent or knowledge of a **responsible insured**; or
   c. The presence of **fungus** on buildings or structures; or
   d. The presence of methamphetamines or other chemicals directly involved in the manufacturing of methamphetamines, in any structure on land and the atmosphere contained within that structure.

Provided the above are in amount, concentrations or level in excess of those naturally present in the environment at the **covered location**.

*Id.* at SSP 6001 06 18 at p. 16 of 17.

40.     The Material Change in Use exclusion under the Policy provides as follows:

This insurance does not apply to **cleanup costs**, **loss**, **claims** or associated **defense costs** based upon, arising out of, or relating to:

**Material Change in Use**

A material change in the use of, or the operations at, a **covered location** from the use or operations identified on the Declarations page of this policy, or on the Schedule Of Covered Locations With Intended Use Or Operations endorsement(s) attached to this policy, unless the change in use or operations at the **covered location** is specifically endorsed onto this policy. A material change in use includes, but is not limited to, a **loss** or required **cleanup costs** resulting from a **pollution condition** on, at or under a **covered location**; or results in the imposition of more stringent remediation standards than those applicable to the **covered locations** as of the effective date of this Policy.

This exclusion applies regardless of when the change in use or operations began.

11

*Id.* at SSP 6001 06 18 at p. 4 of 17.

41. The RIDEM SWMF Regulations prohibit unauthorized operation of a Solid Waste Management Facility and define the operation of a solid waste management facility as ownership and/or operation of any property containing greater than three (3) cubic years of solid waste. 250-RICR-140-05-1 at §§ 1.6 & 135.

42. The SWMF Regulations define "solid waste" as follows:

"Solid waste" means garbage, refuse and other discarded solid, semi-solid liquid and containerized gaseous waste materials generated by residential, institutional, commercial, industrial and agricultural sources but does not include solids or dissolved materials in domestic sewage or sewage sludge, nor does it include hazardous waste, as defined by Subchapter 10 Part 1 of this Chapter, Rules and Regulations for Hazardous Waste Management, nor does it include used asphalt, concrete, Portland concrete element, or tree stumps generated on-site.

250-RICR-140-05-1 at § 187.

43. According to HEI, there has been at least 43,974 cubic yards of solid waste dispersed on the Property.

44. The SWMF Regulations state as follows:

Any person who constructs a Solid Waste Management Facility or Organic Waste Recycling Facility, or installs equipment in the facility without first obtaining approval of the plans and specifications for the facility, or any person who operates the facility without obtaining a license or registration to do so from the Director, may be assessed an administrative penalty of up to twenty-five thousand dollars ($25,000.00). For purposes of these Rules and Regulations, each and every day during which the violation shall be repeated shall be a separate and distinct offense.

250-RICR-140-05-1 at § 1.8(K)(1).

45. The RIDEM has instructed Revity Energy, through HEI, to remediate the Property.

## COUNT I
## DECLARATORY JUDGMENT AS TO COVERAGE

46. Revity Energy repeats and re-alleges the allegations in Paragraphs 1 through 45 in this Complaint and incorporates each of the allegations into this Count, as if fully set forth herein.

47. Pursuant to Rule 57 of the Federal Rules of Civil Procedure and the federal Declaratory Judgment Act (28 U.S.C. § 2201, *et seq.*), a person with an interest in a written contract whose rights, status or other legal relations are affected may seek relief from the United States District Court to have determined any question of construction or validity arising under the contract and may obtain a declaration of rights, status and other legal relations thereunder.

48. An actual and justiciable controversy has arisen between Revity Energy and Nautilus regarding the availability of coverage under the Policy for Revity Energy's claim.

49. Accordingly, Revity Energy seeks a declaration from the Court that:

   a. Revity Energy is an Insured under the Policy;

   b. The various coverage provisions identified herein, specifically, but not limited to, Coverage A, are triggered by Revity Energy's claim;

   c. No Policy exclusion, specifically, but not limited to the "Material Change in Use" exclusion, applies to exclude or otherwise materially limit coverage for Revity Energy's claim; and

   d. The Policy covers Revity Energy's claim.

## COUNT II
## BREACH OF CONTRACT

50. Revity Energy repeats and re-alleges the allegations in Paragraphs 1 through 49 in this Complaint and incorporates each of the allegations into this Count, as if fully set forth herein.

51. The Policy is a valid and enforceable contract between Revity Energy and Nautilus.

52. In the Policy, Nautilus agreed to provide coverage for cleanup costs for which Revity Energy becomes legally obligated to pay as a result of a pollution condition that is first discovered during the policy period.

53. No exclusions apply to bar coverage.

54. Revity Energy complied with all applicable Policy provisions, including paying premiums, providing timely notice of its claim and assisting Nautilus in its claim investigation.

55. Nonetheless, Nautilus has unjustifiably refused to indemnify Revity Energy for its costs that Revity Energy becomes legally obligated to pay for cleanup of the Property.

56. Revity Energy has suffered and continues to suffer damages as a result of Nautilus's breach of the Policy.

57. Revity Energy is entitled to damages as a result of Nautilus's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## COUNT III
## R.I. GEN. LAWS § 9-1-33

58. Revity Energy repeats and re-alleges the allegations in Paragraphs 1 through 57 in this Complaint and incorporates each of the allegations into this Count, as if fully set forth herein.

59. The acts and omissions of Nautilus, as identified in this Complaint, and also yet to be discovered in this matter, constitute bad faith under R.I. Gen. Laws § 9-1-33.

60. Revity Energy is legally obligated to pay cleanup costs as a result of a pollution condition at the Property which was first discovered during the policy period and Nautilus has failed to confirm its duty to indemnify and compensate Revity Energy for the costs.

61. Nautilus breached its statutory duty to refrain from wrongfully and in bad faith refusing to pay Revity Energy's claim by failing to reasonably investigate Revity Energy's claim and provide coverage.

62. Nautilus's denial of coverage, or refusal to timely investigate and respond to the claim, constitutes unfair claims practices under Chapter 9.1 of Title 27 and Chapter 9 of Title 9 of the Rhode Island General Laws.

63. Revity Energy is entitled to compensatory damages and punitive damages as a result of Nautilus's unfair claims practices.

64. Revity Energy has been required to retain the services of attorneys to commence this action and are further entitled to attorneys' fees and costs.

## COUNT IV
## DECLARATORY JUDGMENT AS TO FORUM AND CHOICE OF LAW

65. Revity Energy repeats and re-alleges the allegations in Paragraphs 1 through 64 in this Complaint and incorporates each of the allegations into this Count, as if fully set forth herein.

66. Pursuant to Rule 57 of the Federal Rules of Civil Procedure and the federal Declaratory Judgment Act (28 U.S.C. § 2201, *et seq.*), a person with an interest in a written contract whose rights, status or other legal relations are affected may seek relief from the United States District Court to have determined any question of construction or validity arising under the contract and may obtain a declaration of rights, status and other legal relations thereunder.

67. The Policy contains the following Choice of Law provision:

> The **insured** and the Company agree that all matters or disputes arising hereunder, including any questions relating to the validity, interpretation, performance, and enforcement of this policy, the meaning, interpretation or operation of any term, condition, definition or provision, or the fulfillment of any part of any obligation with respect to the policy, shall be determined in accordance with the law and practices of the State of New York without giving effect to New York conflict of law principles.

15

**Exhibit A** at SSP 6001 06 18 at p. 9 of 17.

68.  The Policy contains the following Forum Selection provision:

> The **insured** and the Company agree that in the event a dispute arises under the policy relating to the validity, interpretation, performance, and enforcement of the policy, the meaning, interpretation or operation of any term, condition, definition or provision, or the fulfillment of any party of any obligation with respect to the policy, all litigation shall take place in the State of New York, and that all parties shall submit to the jurisdiction of any court of competent jurisdiction within the State of New York, including federal courts, and will comply with all the requirements necessary to give such court jurisdiction. In the event of arbitration or other forms of dispute resolution, such resolution shall take place in the State of New York. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to remove an action to a United States District Court.

*Id.* at SSP 6001 06 18 at p. 9 of 17.

69.  Neither the Plaintiff, the Defendant, the Property nor the Policy have any substantial connection to the State of New York.

70.  Whereas Rhode Island, and many other states, have bad faith insurance practices statutes which provide a private right of action for insureds damaged by unfair claims practices, the state of New York does not have any such statutory safeguards.

71.  Additionally, this dispute is inextricably linked to Rhode Island law because Nautilus's position that Revity Energy is not legally obligated to remediate the Property is principally a question of interpretation of Rhode Island's environmental statutes and regulations.

72.  The choice of law provision in the Policy is unenforceable under Rhode Island law because the state of New York has no substantial relationship to the parties or the transaction and the application of New York law in this matter would be contrary to fundamental policy of Rhode Island. *See Governor & Co. of Bank of Scotland v. Wasserman*, 928 F. Supp. 2d 400, 405 (D.R.I. 2013)

73. The forum selection provision in the Policy is unenforceable under federal law because (1) enforcement of this provision would be unreasonable and unjust; (2) proceedings in the contractual forum would be inconvenient for the parties as the witnesses and evidence in the case reside in Rhode Island and (3) enforcement of this provision would contravene strong public policy of Rhode Island as declared by state statute. *See Gem Mech. Servs., Inc. v. DV II, LLC*, No. CA 12-93-M, 2012 WL 2312095, at *2 (D.R.I. June 18, 2012).

74. The Rhode Island General Assembly has declared it a subject of concern that foreign insurers may seek to require in-state insureds to resort to foreign jurisdictions to assert their legal rights under policies of insurance issued in Rhode Island. *See* R.I. Gen. Laws § 27-16-4.

75. More specifically, Rhode Island state law provides that: "If any foreign insurance company, of any name, kind, or description, authorized to do business in this state shall provide in its charter or bylaws, or in the policies or contracts of insurance used by it, that no action shall be brought against the company in any court of competent jurisdiction within this state, the insurance commissioner shall revoke all licenses and certificates granted to it or to its insurance producers to do business in this state." R.I. Gen. Laws § 27-2-15.

76. The choice of law and forum selection provisions in the Policy are unenforceable under Rhode Island and federal law because they would force a Rhode Island insured, with respect to a claim involving Rhode Island property under a Policy issued in Rhode Island, to resort to a foreign jurisdiction, without the protection of Rhode Island's insurance laws, which foreign jurisdiction has no substantial relation to the parties or the transaction *sub judice*.

## REQUEST FOR RELIEF

**WHEREFORE,** Revity Energy respectfully requests that the Court enter judgment in its favor and against Nautilus as follows:

1. A declaration from the Court that:

    a. Revity Energy is an Insured under the Policy;

    b. The various coverage provisions identified herein, specifically, but not limited to, Coverage A, are triggered by Revity Energy's claim;

    c. No Policy exclusion, specifically, but not limited to the "Material Change in Use" exclusion, applies to exclude or otherwise materially limit coverage for Revity Energy's claim; and

    d. The Policy covers Revity Energy's claim.

2. Compensatory and punitive damages and reasonable attorneys' fees pursuant to R.I. Gen. Laws § 9-1-33;

3. Reasonable attorneys' fees pursuant to R.I. Gen. Laws § 9-1-45;

4. Prejudgment interest pursuant to R.I. Gen. Laws § 9-21-10;

5. A declaration from this Court that the forum selection provision and the choice of law provision in the Policy is unenforceable, null and void; and

6. Such other and further relief as the Court may deem just and proper.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**Respectfully Submitted,**

**REVITY ENERGY LLC**


/s/ Nicholas L. Nybo
Nicholas L. Nybo (#9038)
REVITY ENERGY LLC AND AFFILIATES
*Senior Legal Counsel*
117 Metro Center Blvd., Suite 1007
Warwick, RI 02886
Tel: (401) 922-5948
nick@revityenergy.com


/S/ Kyle Zambarano
William M. Dolan (#4524)
Kyle Zambarano (#7171)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607
wdolan@apslaw.com
kzambarano@apslaw.com